**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MATTHEW TODD BOYER, | CASE NO. 1:14-cv-00730-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 9, 10, 13, 14, 15 |

## REPORT AND RECOMMENDATION

### I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Matthew Todd Boyer for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). In this case, Plaintiff established medically determinable mental and physical impairments, and underwent cervical spine discectomy and fusion. With regard to mental impairments, an examining psychologist opined that Plaintiff suffered work-preclusive mental limitations, and

a non-examining, non-treating psychologist opined that Plaintiff could meet the basic mental demands of work.

With regard to physical impairments, a non-examining, non-treating medical expert testified at Plaintiff's hearing before an administrative law judge ("ALJ"). The medical records reviewed by the expert showed "marked" weakness, decreased range of motion, and abnormal reflexes. However, the medical expert mischaracterized the record and concluded that the only symptom present in the record was pain, with normal reflexes, normal strength, and no other abnormalities. The medical expert opined that Plaintiff did not suffer work-preclusive physical limitations. The medical expert indicated that this opinion might change if subsequent imaging demonstrated lumbar spine abnormalities. Two weeks later, lumbar spine X-rays demonstrated degenerative disc disease. Plaintiff subsequently underwent an examination with a state agency physician, who observed abnormal reflexes and other findings. This physician opined that Plaintiff could only sit, stand or walk for six to eight hours out of an eight-hour workday and could never push, pull, climb, balance, stoop, kneel, or crouch.

The ALJ credited the reviewing medical opinions over the examining medical opinions. The ALJ rejected most of Dr. Goodman's limitations. However, with regard to Plaintiff's physical impairments, the reviewing physician made factual errors and mischaracterized the record. The medical expert also expressly

relied on lack of lumbar spine impairment, which was subsequently established with X-rays. The Regulations also establish a preference for examining over non-examining medical opinions. Given the reviewing physician's mischaracterization of the record and omission of significant objective findings, along with the preference for examining over non-examining medical opinions, the Court cannot conclude that substantial evidence supports the ALJ's assignment of weight to the medical opinions. As a result, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II. Procedural Background

On February 8, 2012, Plaintiff filed an application for DIB and SSI under the Act. (Tr. 323-35). On July 3, 2012, the Bureau of Disability Determination denied Plaintiff's application (Tr. 168-93), and Plaintiff filed a request for a hearing on July 26, 2012. (Tr. 208-09). On April 23, 2013, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a medical expert appeared and testified. (Tr. 56-103). On October 7, 2013, an ALJ held a second hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 104-67). On October 21, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 31-55). On December 19, 2013, Plaintiff filed a request for review with the Appeals Council

(Tr. 29-30), which the Appeals Council denied on February 24, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On April 15, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On June 25, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On September 8, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 13). On October 14, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 14). On October 21, 2014, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 15). On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial

evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.  The Commissioner must sequentially

determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on August 19, 1973 and was classified by the regulations as a younger individual on his date last insured. 20 C.F.R. § 404.1563. (Tr. 46). Plaintiff has at least a high school education and past relevant work as a tractor

trailer truck driver, tank driver, industrial truck operator, and saw operator. (Tr. 46).

## A. Function Report and Testimony

On March 19, 2012, Plaintiff's father completed a third-party function report. (Tr. 383). He reported that Plaintiff had problems dressing and washing his feet. (Tr. 384). He indicated problems lifting, squatting, bending, standing, walking, kneeling, and climbing stairs. (Tr. 388). Plaintiff also completed a function report. (Tr. 405). He reporting problems dressing, bathing, and using the toilet. (Tr. 406). He indicated problems lifting, squatting, bending, standing, walking, kneeling, reaching, and climbing stairs, along with memory, completing tasks, concentration, understanding, and following instructions. (Tr. 388). He indicated that filling out the form was "not easy" due to discomfort and difficulty concentrating. (Tr. 412). He reported constant, sharp, stabbing pain. (Tr. 413). He explained that his pain medication only took "the edge off." (Tr. 414).

At the hearing before the ALJ, Plaintiff's attorney represented that Plaintiff had been drug-free throughout the relevant period. (Tr. 65). He testified that he had initially recovered after his cervical spine surgery, but that his neck pain subsequently got worse. (Tr. 134, 138). He testified to pain in his hip and back that made it difficult to walk. (Tr. 134). He also explained that, on some days, he was exhausted and had trouble sleeping. (Tr. 140). He was treating with a therapist

once a week for mental impairments. (Tr. 145). He testified to problems with focus, attention, and concentration. (Tr. 146). He testified that his mind races and experienced restlessness. (Tr. 148). He testified that he used to socialize but was depressed and no longer wanted to be around people. (Tr. 150).

## B. Medical Evidence

Plaintiff asserts onset of disability on May 30, 2012. Right before his alleged onset, on May 24, 2012, Plaintiff underwent a left total hip arthoplasty after experiencing progressively worsening left hip pain. (Tr. 711). He had no prior history of steroid use, no trauma to hip, and no congenital condition. (Tr. 709). He had treated with physical therapy but made minimal progress. (Tr. 654-73). Prior to the surgery, he was diagnosed with degenerative joint disease in his left hip after X-rays demonstrated "significant degenerative joint disease in [the] left hip." (Tr. 710). At a follow-up on July 5, 2012, Plaintiff was not using crutches, he had stopped taking his pain medications, and he had no pain in his hip. (Tr. 765). He reported some soreness in his mid-back. (Tr. 765). On July 12, 2012, Plaintiff reported difficulty walking and pain in his left hip after it was "jammed" while he was riding a motorcycle.(Tr. 766).

On August 6, 2012, Plaintiff presented to Kathryn Mueller, PA-C, at the Orthopedic Institute of Pennsylvania complaining of "pain in his cervical and thoracic spine for years." (Tr. 718). "[X]-rays that he brought with him from

Hamilton Health Center…showed some degenerative changes in the cervical spine with a kyphotic deformity in the thoracic spine." (Tr. 718). Plaintiff reported constant pain in his neck that was "really affecting his ability to go through his activities of daily living." (Tr. 718). His physical examination indicated "pain with movement of the neck especially in extension. His arms are neurovascularly intact as far as biceps, triceps, and brachioradialis reflexes, strength, sensation and range of motion. Negative Spurling's and Lhermitte's." (Tr. 718). Plaintiff was prescribed a tapering dose of prednisone, Valium, and Voltaren gel and instructed to perform home exercises. (Tr. 718).

On August 31, 2012, Plaintiff followed-up with Ms. Mueller. (Tr. 716). Plaintiff reported his home exercises had made him feel worse and that "the pain in his neck is stopping him from doing any type of labor employment and may be seeking disability." (Tr. 716). Plaintiff's examination was normal, with "good range of motion of his neck with a negative Spurling's and Lhermitte's. His reflexes in his biceps, triceps and brachia radialis were intact and equal bilaterally. He has good vascular exam. His strength to grip strength, thumb extension and strength against resistance was intact and equal bilaterally. He had no lower tract signs." (Tr. 716). Ms. Mueller ordered an MRI and opined that she "did not feel he was disabled but since I had only met him only once previously, I would defer this recommendation until after I see the MRI of his spine. From a functional

standpoint, it appears that his neck and his arms move pretty well and are fairly strong." (Tr. 716).

In September of 2012, the MRI indicated "multilevel chronic degenerative disc disease with posterior marginal osteophytes and disc bulges. The findings are most pronounced at C6-C7 where there is severe bilateral neural foraminal narrowing." (Tr. 722).

On September 12, 2012, Plaintiff followed-up with Ms. Mueller. (Tr. 714). She noted that the "MRI did reveal a fair amount of disc disease at multiple levels in addition to some disc osteophyte complex at C6-7 with some flattening of the cord and foraminal stenosis" but that he had "no real focal neurologic findings…and I am not sure that his significant findings on his MRI are related to the symptoms that he is feeling." (Tr. 714). Ms. Mueller scheduled him for an epidural injection, referred him to a spinal surgeon, and deferred discussion of his disability to the surgeon. (Tr. 714).

Plaintiff also began physical therapy, attending sixteen sessions in September, October and November of 2012. (Tr. 738-64). His initial evaluation indicated decreased range of motion in the cervical spine and decreased strength in his upper extremities. (Tr. 760).

On September 26, 2012, Plaintiff presented to Dr. Malik Momin, M.D., of Susquehanna Valley Pain Management, for a series of epidural injections. (Tr.

736). Plaintiff reported symptoms "primarily in his arms into his elbows and hands, slightly worse on the right than on the left." (Tr. 736). Plaintiff's neuromusculoskeletal examination indicated "some tenderness in the cervical paravertebral muscles, slightly worse towards the right. Reflexes were diminished in the biceps and triceps. Grip strength was equal bilaterally. Sensory exam was intact to light touch." (Tr. 737). They proceeded with the injection and Plaintiff was "advised against bed rest and to resume or maintain normal activities after 24 hours." (Tr. 737). After his injection, he reported to his physical therapist that his strength was coming back and he was observed to have increased mobility. (Tr. 753).

On October 10, 2012, Plaintiff followed-up with Dr. Momin and reported "considerable improvement from his last injection. He still has some residual pain, primarily in his right neck and right arm and presents today for the second injection as planned." (Tr. 732). Plaintiff's examination was unchanged since the last visit. (Tr. 732). Plaintiff was instructed to follow-up if any further injection was needed. (Tr. 732). On October 23, 2012, he demonstrated good range of motion in his cervical spine at physical therapy, "noted much less pain" with motion, and that his activities of daily living had improved. (Tr. 751). Plaintiff had decreased strength and range of motion on November 1, 2012. (Tr. 746-47).

On November 7, 2012, Plaintiff followed-up with Dr. Momin "for a third injection because of recurrence of pain. He had been doing fairly well following the second injection and has returned to work as a warehouseman but has had a flare-up of pain that radiates into his arms, more on the right than on the left." (Tr. 730). His examination was unchanged and he was instructed to follow-up if additional injections were needed. (Tr. 730). The same day, he reported to his physical therapist that he experienced symptoms two hours into his shift. (Tr. 743). On November 12, 2012, Plaintiff reported to his physical therapist that he was very fatigued from working. (Tr. 740). On November 15, 2012, he continued to demonstrate improved range of motion but also continued to demonstrate postural weakness and tightness. (Tr. 742). He was instructed to continue another four to six weeks of physical therapy. (Tr. 742). However, on November 26, 2012, he was discharged after achieving maximal benefit from therapy. (Tr. 738). He was assessed to have "20%" disability related to his cervical spine and had met about half of his goals for therapy. He was restricted from "heavy" lifting. (Tr. 738).

On February 5, 2013, Plaintiff presented to Dr. Curtis Goltz at the Orthopedic Institute of Pennsylvania complaining of "pain in his neck and arms for years. He describes it as a dull ache with burning and frank weakness of left greater than right. He states at times it has been debilitating." (Tr. 767). Physical examination indicated:

[A]ntalgic gait. His neck demonstrates good gross alignment. He has marked paraspinal ropiness. Marked limitation in rotation, flexion and extension. He has a markedly positive Spurling's. His bilateral upper extremities though no atrophy demonstrate marked weakness in thumb/index pinch on the left. He has moderate hyperreflexia on the left, mild on the right.

(Tr. 767). Dr. Goltz explained:

His worse levels are C5-6 and C6-7. We discussed treatment options. Having multiple epidural injections, physical therapy, and activity modification at this point he is planning his life around his neck and is getting increased weakness about his left arm. I recommended to him an anterior cervical discectomy at the C5-6 and C6-7 levels.

(Tr. 767).

On March 4, 2013, Plaintiff underwent an anterior cervical discectomy and fusion at C5-6 and C6-7. (Tr. 771, 803). At a two-week follow-up on March 16, 2013, Plaintiff reported "feeling good" with some pain in his left shoulder. (Tr. 803). Plaintiff indicated that before his surgery he was feeling severe neck pain and could not move forward, but "now he could shave, leaning forward…no pain." (Tr. 803). Plaintiff removed his neck collar for physical examination and could move it sideways without pain. (Tr. 803). Plaintiff was noted to have his "pain under control." (Tr. 804). On July 2, 2013, Plaintiff had a three-month follow-up. (Tr. 803). He was "doing well in terms of neck pain since surgery, does get intermittent pain in [left] arm, also continues to have pain in the mid-back especially when carrying or lifting or when sitting and going from a forward position to sitting up straight." (Tr. 803). He was referred to an orthopedist. (Tr. 803).

On May 24, 2013, X-ray of Plaintiff's lumbar spine indicated degenerative disc disease at L1-2, L3-4, L4-5 and L5-S1 with no acute fracture, pars defect or subluxation. (Tr. 782).

## C. Opinion Evidence

Plaintiff's treating physicians opined that he would be disabled due to physical and mental impairments from March of 2012 to at least January of 2013, and might not be able to maintain a regular schedule. (Tr. 693-98, 805).

On May 30, 2012, Plaintiff presented to Stanley E. Schneider, Ed.D., for a consultative examination. (Tr. 682-688). Plaintiff was using crutches after having his hip replaced six days earlier. (Tr. 682). Plaintiff reported:

> [L]ast working on June 6, 2011 as a local truck driver. His pain impacted his attendance. He also reports that he failed a random drug test with the results showing positive for cocaine in his system. The last time he reports using cocaine was on that date.
>
> He reported an incident with bath salts in December of 2011.. He then made reference to being shot twice, jailed 51 days, charged with robbery, bodily injury and conspiracy, and notes that he has a court date upcoming in June related to the robbery attempt.

(Tr. 683). In describing his depression, Plaintiff indicated "ups and downs ... my downs happen all of a sudden ... they just come ... I feel scared and worthless ... crying spells ... low energy, no motivation, tired a lot but I have a hard time sleeping ... " and that when he feels up, he feels "real high…really feeling good." (Tr. 683). His mental status examination indicated:

> Eye contact varied. It is noted he had difficulty focusing which required questions to be repeated to him. He seemed at times other directed. He admits that his head was going and he was not really understanding the questions posed to him…his speech was soft and relevant and oriented… presents dysphoric…affect was somewhat subdued and constricted….stream of thought reflected a slow rate, low volume and acceptable articulation…correctly identified the president… does not know the current governor…was able to identify one pair of similarities and one simple proverb… other attempts reflected as being rather concrete. He was able to do serial 5s acceptably. Attention and concentration are impaired at this contact. He had difficulty doing more than three digits backward.

(Tr. 687). Dr. Schneider diagnosed Plaintiff with depression and rule out bipolar disorder. (Tr. 687). Dr. Schneider opined that Plaintiff had marked limitations in handling detailed instructions due to his impaired concentration and focus. (Tr. 689). He also opined that Plaintiff had marked limitations in his ability to respond to work pressures in a usual work setting. (Tr. 689). He opined that Plaintiff had no more than slight limitations in any other area of work setting. (Tr. 689).

On June 28, 2012, Dr. Roger Fretz, Ph.D., reviewed Plaintiff's file and authored an opinion. (Tr. 173). He opined that Dr. Schneider's opinion was not consistent with the medical records. (Tr. 177). He indicated that Plaintiff is capable of self-care, hygiene, activities of daily living, interacting and engaging socially. (Tr. 177). He noted that alcohol was a "significant factor" in Plaintiff's hospitalizations. (Tr. 177). He concluded that Plaintiff had "some difficulty with concentration and tasks persistence" but was "able to understand and complete simple instructions." (Tr. 177). He opined that Plaintiff was moderately limited in

his ability to handle detailed instructions, maintain attention and concentration for extended periods, and work in coordination or proximity to others without being distracted by them. (Tr. 177). He opined that Plaintiff did not have adaptation limitations. (Tr. 177).

On April 24, 2013, Dr. John Sabow, M.D., provided opinion testimony at the hearing before the ALJ. (Tr. 69). He opined that Plaintiff had degenerative disc disease of the cervical spine, with "arthritic changes at multiple levels of the cervical spine" and "stenotic" canals. (Tr. 74). Dr. Sabow continued, "[b]ut he still has good strength in the upper extremities…This is somewhat complicated by the gunshot wound, which may have caused some disease of the brachial plexus, of the nerves that - -that went through the upper chest and then fractured the third rib on the left side. And then fractured the scapula. Following that gunshot, he did have weakness of the left upper extremity. However, there's never been any ongoing examination on that to pinpoint whether the weakness that was initially found in the left upper extremity was primarily from the gunshot or from his cervical arthritis." (Tr. 74-75). He noted that "after the gunshot there was some weakness of the left upper extremity. However, the examinations later on -- and in fact, in this year, as of February 2013, the patient only had minimal weakness in the -- an index pinch examination on the left. In other words, even though the patient has significant degenerative arthritic changes of the cervical spine, literally, the only

abnormalities would be subjective. And that would be pain. For he had good reflexes in the biceps, and triceps, and brachioradialis reflexes. There's no indication that there's a sensory abnormality. And there's no atrophy. So, that that even though he has the arthritic changes, the most relevant problem would be neck stiffness and neck pain." (Tr. 76). When asked if neck pain and stiffness would have more than a minimal impact on Plaintiff, Dr. Sabow responded, "at his relatively young age -- is minimal. It's not major. It's a minimal abnormality." (Tr. 76). Dr. Sabow noted that, "from a neurologic standpoint," there was no other medically determinable impairment, although he indicated that a lumbar spine MRI would have been useful given the severity of arthritic changes in his hip and cervical spine for a man his age. (Tr. 76-77). When asked if he found "any impairment established, with regard to the claimant's left hip," he replied, "[no]. I have not. In fact, all of the reports are that he has made a nice recovery. He has occasional pain. Sometimes, you know, he uses a cane. But he's able to ambulate very well, on many occasions, without any adaptive devices. And he has full range [of motion]." (Tr. 79). Dr. Sabow explained that, although the degenerative changes in his cervical spine were "significant," they did not have more than a minimal effect on his function because there was no "impingement on the nerves" that would cause decreased reflexes, atrophy, weakness, and sensory deficits. (Tr. 91). He explained that there were no "neurological abnormalities that would

impact his ability to use the upper extremities in any way at this point. In other words, what we have is arthritic -- pure arthritic changes, but without the impingement or impact to the neurologic system that would decrease his ability" to use his upper extremities. (Tr. 91-92). He opined that Plaintiff's discectomy was "as much preventative surgery…as there was to relieve the pain." (Tr. 96).

Dr. Sabow opined that Plaintiff could stand or sit for eight hours in an eight-hour workday and could walk continuously for four hours in an eight-hour workday. (Tr. 83). He opined Plaintiff could lift twenty pounds frequently and forty pounds occasionally. (Tr. 83-84). He opined that Plaintiff could occasionally climb stairs, stoop, kneel, crouch, and squat, and could never climb ropes and ladders or climb on his hands and knees. (Tr. 84-85). He also indicated that, if abnormalities were documented on a lumbar MRI at a subsequent consultative examination, then his opinion might change. (Tr. 91-96).

On May 16, 2013, Plaintiff presented to Dr. Bruce Goodman, M.D., for a consultative examination. (Tr. 770). Plaintiff complained of discomfort between his shoulder blades and indicated that his thoracic spine remained uncomfortable after his discectomy. (Tr. 771). He reported that he "no longer has severe discomfort in the area of the left total hip replacement, however is bothered in the low back area with more discomfort on the left than the right. He does not have a lower extremity radiculitis and/or paresthesias of the lower extremities." (Tr. 771).

Plaintiff reported that he felt "stabilized to a point after one year of psychiatric evaluation and treatment, but he has not noticed any significant improvement recently." (Tr. 771). Dr. Goodman noted that he was "capable of walking short distances and performing activities of light cleaning and grocery shopping." (Tr. 771). On physical examination, Plaintiff had a normal gait, although he needed to stretch before ambulating, he "resist[ed] extension beyond ten degrees with thirty degrees normal" and no cervical muscle spasm. (Tr. 772). He had decreased range of motion in the cervical spine, "definite scapular winging on the right compared to the left…[and] diminished but present biceps and triceps, as well as periosteal radial reflexes bilaterally." (Tr. 772). He had "extremely good hand grasp bilaterally with some increase on the right compared to the left," brisk reflexes, no difficulty getting on and off the examination table, negative straight leg raise, and normal strength. (Tr. 772).

He opined that Plaintiff could sit for four hours out of an eight hour day, stand for one to two hours for an eight-hour day, and walk for one to two hours out of an eight-hour day. (Tr. 776). He opined that Plaintiff could never push or pull with either hand, climb, balance, stoop, kneel, or crouch. (Tr. 777-78). Dr. Goodman noted that he "listed this man's physical capabilities based upon the fact that he is now two months post-operative from his recent operative intervention. I do feel that his work capabilities will be increased at a 6 month level and would

suggest reevaluation at that time. My restrictions at this time were based upon his recent intervention surgically." (Tr. 773).

### D. ALJ Findings

On October 21, 2013, the ALJ issued the decision. (Tr. 48). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 30, 2012, the alleged onset date. (Tr. 36). At step two, the ALJ found that Plaintiff's status post anterior cervical discectomy and fusion, lumbar degenerative disc disease, and depression were medically determinable and severe. (Tr. 36). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 38). The ALJ found that Plaintiff had the RFC to perform:

> [L]ight work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following limitations: the claimant must have normal breaks (defined by the vocational expert); occasional foot/leg pedals and levers with the left lower extremity; can occasionally climb stairs, stoop, kneel, crouch and reach overhead bilaterally; should never crawl or climb ropes, ladders, scaffolding and poles; must avoid concentrated exposure to extreme cold and wet/water/liquids, work around or with large hazardous machinery, work around large fast moving machinery on the ground, work in high exposed places, work around or with sharp objects, and work around or with toxic/caustic chemicals; and limited to simple duties that can be learned on the job in a short period of time.

(Tr. 40). At step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 46). At step five, the ALJ found that Plaintiff could perform other work in the national economy. (Tr. 46). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 47).

## VI.    Plaintiff Allegations of Error

## A.    Evaluation of the medical opinions

Plaintiff asserts that the ALJ erred in crediting Dr. Sabow's opinion over Dr. Goodman's opinion. (Pl. Brief). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Opinions can come from various sources, including treating physicians, examining physicians, and non-examining physicians. 20 C.F.R. §§ 404.1527(c)(1)-(2). Section 404.1527(c)(1) provides that, "[g]enerally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.*

Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to

specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

Here, the ALJ erred in relying on Dr. Sabow's opinion because Dr. Sabow's opinion mischaracterized the record. *See Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981) ("Since the ALJ…misconstrued the evidence considered, his conclusion…must be reconsidered"). Dr. Sabow testified that Plaintiff "has good strength in the upper extremities… as of February 2013, the patient only had minimal weakness…literally, the only abnormalities would be subjective. And that would be pain. For he had good reflexes in the biceps, and triceps, and brachioradialis reflexes." (Tr. 74-75). Dr. Sabow may have been relying exclusively on Ms. Mueller, who observed no neurological deficits. (Tr. 714).

However, subsequent to Ms. Mueller's examinations, physical therapists observed decreased range of motion and decreased strength in his upper extremities. (Tr. 760). Physical therapists also observed postural weakness. (Tr. 730). Dr. Momim, a pain management specialist, observed decreased reflexes on multiple occasions (Tr. 732, 737), along with decreased strength and range of motion. (Tr. 746-47). Contrary to Dr. Sabow's assertion, Plaintiff's treatment record from February of 2013 did not indicate "minimal" weakness, it indicated "marked weakness" in his upper extremities. (Tr. 74-75, 767). During this same visit, Dr. Goltz observed "antalgic gait… marked paraspinal ropiness. Marked

limitation in rotation, flexion and extension…markedly positive Spurling's… moderate hyperreflexia on the left, mild on the right." (Tr. 767). Dr. Goltz explained Plaintiff's "worse levels are C5-6 and C6-7. We discussed treatment options. Having multiple epidural injections, physical therapy, and activity modification at this point he is planning his life around his neck and is getting increased weakness about his left arm. I recommended to him an anterior cervical discectomy at the C5-6 and C6-7 levels." (Tr. 767).[1] In May of 2013, Dr. Goodman observed decreased range of motion and decreased reflexes, with "definite scapular winging on the right compared to the left…[and] diminished but present biceps and triceps, as well as periosteal radial reflexes bilaterally." (Tr. 772). Thus, Dr. Sabow mischaracterized the record in concluding that the only symptom of Plaintiff's arthritic changes was pain. Moreover, Dr. Sabow expressly conditioned his opinion on a lack of imaging demonstrating lumbar spine impairments. (Tr. 91-96). Two weeks later, X-rays demonstrated lumbar spine abnormalities. *Supra*.

Given the multiple errors in Dr. Sabow's opinion and the preference for examining over non-examining opinions, Dr. Sabow's opinion does not provide substantial evidence to the ALJ's RFC assessment. *See* 20 C.F.R. §404.1527(c)(1). Moreover, the Court cannot conclude that the ALJ provided a sufficient

---

[1] Even assuming Plaintiff fully improved after his surgery, there is no evidence the ALJ considered whether awarding a period of disability was appropriate.

explanation to reject Dr. Goodman's opinion. As the Third Circuit explained in *Fargnoli v. Massanari*, 247 F.3d 34 (3d Cir. 2001):

> This Court has long been concerned with ALJ opinions that fail properly to consider, discuss and weigh relevant medical evidence. *See Dobrowolsky v. Califano,* 606 F.2d 403, 406–07 (3d Cir.1979) ("This Court has repeatedly emphasized that the special nature of proceedings for disability benefits dictates care on the part of the agency in developing an administrative record and in explicitly weighing all evidence."). Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided. *See Cotter,* 642 F.2d at 706 (listing cases remanded for ALJ's failure to provide explanation of reason for rejecting or not addressing relevant probative evidence).

*Id.* at 42. Moreover, Dr. Goodman's opinion was supported by the opinions of Plaintiff's treating physicians. (Tr. 693-98, 805). The ALJ repeated Dr. Sabow's errors, rejecting Dr. Goodman's opinion because the records showed no "weakness in the upper extremities." (Tr. 44). Thus, the Court recommends remand for the ALJ to properly assess the medical opinions and craft Plaintiff's RFC.

Because the Court recommends remand on these grounds, it declines to address Plaintiff's other allegations of error. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.     The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: October 8, 2015         _____s/Gerald B. Cohn_____

                                          GERALD B. COHN
                                   UNITED STATES MAGISTRATE JUDGE